In re COHOES INDUSTRIAL TERMINAL, INC., Debtor.

Bankruptcy No. 86 B 20201.

United States Bankruptcy Court, S.D. New York.

Oct. 9, 1987.

Leon C. Baker, White Plains, N.Y., Special Counsel for Trustee.

John F. Scheffel, New York City, Chapter 11 Trustee.

Zubres, D'Agostino & Hoblock, P.C., Albany, N.Y., for Latham Sparrowbush Associates.

## DECISION ON OBJECTION TO CLAIM OF LATHAM SPARROWBUSH ASSOCIATES

HOWARD SCHWARTZBERG, Bankruptcy Judge.

This Chapter 11 debtor, Cohoes Industrial Terminal, Inc. ("CIT"), for whom a trustee has been appointed, objects to the claim of the landlord of the premises in question, Latham Sparrowbush Associates ("LSA"). LSA has asserted a claim in the amount of $2,307,391.00 as follows: $1,300,000.00 for the tenant's violation of the obligation to maintain and repair the leased property; $162,391.00 for contingent rent, and $845,000.00 for use and occupancy. The debtor denied the claim and asserted certain affirmative defenses. The main defense is that the debtor only held bare legal title to the leasehold interest and that it was merely the nominee or agent for Gloria Baker, who was the declared principal and beneficial owner of the leasehold. Gloria Baker is the wife of Leon Baker, who is a principal shareholder and president of the debtor, as well as its former counsel. He has been retained by the Chapter 11 trustee as special counsel to litigate the debtor's objection to LSA's claim. Additionally, the debtor has asserted other affirmative defenses, including *res judicata*, the statute of limitations, the splitting of a cause of action which bars all of LSA's claims after it obtained a default judgment against the debtor in state court, merger of claims by LSA's acceptance of the conveyance of the leasehold interest, and merger by judgment

and waiver of claims by LSA's acceptance of rent after the termination of the lease.

## FINDINGS OF FACT

1. On April 28, 1986, the debtor, CIT, filed with this court its petition for relief under Chapter 11 of the Bankruptcy Code. The debtor was named as lessee under two leasehold interests. One lease involved an industrial terminal located at 100 North Mohawk Road, Cohoes, New York. The lessor of these premises is the Coleman Capital Employee's Profit Sharing Trust which is an entity controlled by Leon Baker, who is also special counsel and a shareholder and president of the debtor. When the Baker-controlled debtor did not pay rent to the Baker-controlled lessor, the latter terminated the lease and put in as a new tenant another Baker-controlled entity which he formed, known as Cohoes Terminal, Inc. Thus, the debtor no longer has any interest in the industrial terminal. The other leasehold interest to which the debtor is a party is an eleven-building garden apartment complex in Latham, New York, known as Sparrowbush Apartments, with respect to which LSA is the lessor. The debtor disclaims any beneficial interest in this leasehold and contends that Gloria Baker, the wife of Leon Baker, is the true beneficial tenant and that the lease was put in the debtor's name as an unrecorded, verbal nominee of Gloria Baker, who is the real tenant. Therefore, the debtor argues that LSA's claims should be asserted against Gloria Baker, who now assumes full responsibility for all leasehold claims, with the result that the debtor should not be liable for any of the claims filed by LSA in this case. Moreover, the debtor maintains that LSA's termination of the lease did not affect Gloria Baker's interest as the true lessee, because the debtor was merely her designated nominee and that the debtor never had possession of the leased premises.

2. This court had previously ruled that Leon Baker, as special counsel for the debtor, was disqualified from asserting this kamikaze defense because, if successful, the debtor would be deprived of the $350,000 payment that LSA had to pay as considera-tion for its right to exercise a termination option contained in Article 32 of the lease for the Sparrowbush premises. *In re Cohoes Industrial Terminal, Inc.*, 69 B.R. 717 (Bankr.S.D.N.Y.1987). Having subsequently accepted an assignment of Gloria Baker's interest in these funds, the Chapter 11 trustee now reasserts this defense, and has retained Leon Baker, as special counsel, to litigate the merits of LSA's claim.

3. The Coleman Capital Employee's Profit Sharing Trust ("Coleman Trust") is another Baker-controlled entity that participated in the facts relating to the debtor's involvement in the Sparrowbush Apartments leasehold. The Coleman Trust is an entity whose trustees are Leon Baker and his wife, Gloria Baker. The sole beneficiaries of the Coleman Trust are also Leon Baker and his wife, Gloria Baker. Leon Baker acts as counsel for the Coleman Trust. The Coleman Trust served to fund a portion of the transaction which resulted in title to the leasehold being transferred to the debtor. The Coleman Trust holds a wrap-around mortgage on the Sparrowbush Apartment premises for approximately $205,000.

4. William Magee is the executive vice president, an employee of the debtor, CIT, and personally supervised and managed the industrial terminal in Cohoes, New York until its lease was terminated by the Baker-controlled Coleman Trust, which is the lessor of the premises. Magee also personally supervised and managed the Sparrowbush Apartments. He also performed other management services over the past twenty years at the request of Leon Baker at various facilities with respect to which Leon Baker had an interest. Magee participated with Leon Baker in the transaction whereby LSA leased the Sparrowbush Apartments in question to the debtor, CIT, as lessee on December 31, 1973.

5. This case represents a continuation of the two-party dispute originally commenced in the state courts and before an arbitration panel between LSA and the debtor, including its officers, Leon and Glo-

ria Baker. Apart from the claim of LSA, which is the subject of the debtor's instant objection, there are only two scheduled creditors who are non-Baker related entities; namely, Niagara Mohawk Gas & Electric Co. for $15,704 and Blue Shield for $1,417. Leon Baker claims approximately $17,500 for legal fees and disbursements; Gloria Baker claims $1,375 for bookkeeping services; The Coleman Employee's Profit Sharing Trust claims $13,750 for rent and The Coleman Capital Corporation claims $1,100.

## PROCEDURAL BACKGROUND

6. On August 28, 1968, Latham Sparrowbush Corp., as landlord, and Shaker Estates, Inc. as tenant, executed a lease of an apartment complex in Albany County, New York, known as Sparrowbush Apartments. On the same day Latham Sparrowbush Corp. deeded the property over to Latham Sparrowbush Associates ("LSA"). On December 31, 1973, Shaker Estates, Inc. assigned its rights under the lease to Cohoes Industrial Terminal, Inc., the debtor in this case.

7. On August 27, 1975, the debtor and LSA entered into an Amendment of Lease, amending the lease dated August 28, 1968, which was executed by Latham Sparrowbush Corp. as lessor and Shaker Estates, Inc. as lessee. LSA had succeeded to the rights of the lessor and the debtor had succeeded to the rights of the lessee by assignment. The Amendment of Lease followed a default in the payment of rent by the debtor, which resulted in a settlement of this rent default pursuant to a settlement agreement entered into between the debtor and LSA, also dated August 27, 1975. Pursuant to the Amendment of Lease, the debtor's monthly interest and amortization payments under the mortgage held by the Manhattan Savings Bank were reduced, in exchange for the debtor's agreement to pay LSA an additional fixed

rent, an additional contingent rent and an additional bonus rent.

8. On December 26, 1984, LSA gave notice of its exercise of an option to terminate the Lease, effective 60 days from the giving of notice, pursuant to Article 32 of the Lease.[1] Leon C. Baker, president of the debtor, sent LSA a letter acknowledging receipt of the notice on December 27, 1984. The letter also questioned the validity of Article 32 of the Lease, because of an alleged violation of the rule against perpetuities.

9. On January 12, 1985, Gloria F. Baker commenced a declaratory action in state court seeking various relief with respect to the Lease. Gloria F. Baker is the secretary of the debtor. The plaintiff's attorney in that case was her husband, Leon C. Baker, who is also president of, and attorney for, the debtor.

10. On or about February 8, 1985, Gloria F. Baker made a motion for summary judgment seeking, among other things, a declaration that Article 32 of the Lease was invalid because the repurchase option granted therein to LSA violated the rule against perpetuities. Defendant LSA cross moved to dismiss the complaint on the ground that Gloria F. Baker lacked standing to sue because she was not in privity with LSA and had no connection with the Lease. By a decision entered April 30, 1985, and order dated June 20, 1985, Justice Anthony Cerrato of the New York Supreme Court, Westchester County, dismissed Gloria F. Baker's complaint, holding that she had no standing to question the validity of the Lease as she was a legal outsider to it. The court specifically refused to reach any other issue. The debtor's motion to reargue was denied.

11. On or about February 11, 1985, LSA commenced an action against the debtor by service of two copies of a summons and complaint on the Secretary of State pursu-

---

1. The relevant portion reads as follows:
   Section 32.01 The Landlord reserves the right to terminate or receive an assignment of this lease and the term hereof, upon giving sixty (60) days notice in writing to the Tenant of Landlord's intention so to terminate the lease and the lease shall cease, determine and end at the expiration of sixty (60) days from the day when such notice is given.

ant to N.Y.B.C.L. § 306.[2] The debtor had designated an attorney as its agent who apparently died prior to the service of the summons and complaint with the result that the debtor never received that copy of the papers.

12. A copy of LSA's summons and complaint was annexed as an exhibit to LSA's cross motion in the action between Gloria F. Baker and LSA, which was served prior to February 25, 1985.

13. On February 25, 1985, LSA's exercise of its option to terminate the Lease became effective. (No stay of the termination of the Lease has been sought or granted). On March 15, 1985 the debtor defaulted in answering.

14. On April 18, 1985, an order and default judgment was signed by Justice Lawrence E. Kahn of the New York Supreme Court, Albany County, which:

(1) held that Article 32 of the Lease was valid and enforceable;

(2) directed the debtor to deliver possession of the premises to Associates;

(3) ordered that, upon delivery of possession, LSA tender to the debtor a certified check for $350,000 to the order of, or endorsed over to the debtor. (the debtor acknowledged receipt of the funds on March 27, 1986).

15. On April 19, 1985, the order was entered. On May 20, 1985, Justice Kahn denied the debtor's motion to vacate the default judgment entered on April 19, 1985, which was made pursuant to C.P.L.R. § 5015.

16. On June 21, 1985, the New York Supreme Court, Appellate Division, Third Department granted a stay of execution of the April 19, 1985 order and judgment pending debtor's appeal to the Third Department.

17. On October 10, 1985, a unanimous Appellate Division affirmed Justice Kahn's denial of the debtor's motion to vacate the default judgment pursuant to C.P.L.R. § 5015(a) and C.P.L.R. § 317 on the dual grounds that (1) a corporation is under an obligation to notify the Secretary of State of a change of address and failure to do so is not a reasonable excuse, and (2) that the debtor had had actual notice by receipt of the summons and complaint in time to defend. On October 16, 1985, the Appellate Division entered an order affirming the April 19, 1985 order.

18. On December 20, 1985, the Appellate Division entered an order denying the debtor permission to appeal to the Court of Appeals. *Latham Sparrowbush Associates v. Cohoes Industrial Terminal, Inc.*, 114 A.D.2d 584, 494 N.Y.S.2d 195 (3rd Dep't 1985).

19. On February 13, 1986, the New York Court of Appeals denied the debtor's appeal from the order denying leave to appeal from the order of the Appellate Division on the ground that the denial was an interlocutory order. *Latham Sparrowbush Associates v. Cohoes Industrial Terminal, Inc.*, 67 N.Y.2d 736, 500 N.Y.S.2d 100, 490 N.E.2d 1226 (1986). On March 27, 1986, the New York Court of Appeals denied the debtor's motion to reargue its appeal from the Appellate Division's denial of leave to appeal.

20. On March 27, 1986, Justice Kahn of the Supreme Court signed an order which:

(1) appointed a post-judgment receiver for the collection of rents pursuant to C.P.L.R. § 5105;

(2) ordered that the receiver take possession of the premises;

(3) that the tenants in possession, their agents and employees surrender possession, the keys and current leases;

(4) that any person or persons in possession of the premises who do not have valid leases give up possession;

(5) authorized the receiver to manage the property;

(6) enjoined the debtor and all other persons other than the receiver from collecting rents, interfering with possession

---

**2.** N.Y.B.C.L. § 306 provides that any domestic or licensed foreign corporation may be served with process by delivering 2 copies of the Summons and Complaint to the New York Secretary of State or his designee. The New York Secretary of State retains one copy and sends the other via certified mail to the address listed by the corporation for service of process.

and ordering them to transfer to the receiver all security deposits until possession is delivered to LSA.

(7) ordered the receiver to post a bond.

21. On April 24, 1986, the Appellate Division entered an order denying the debtor's motion for a stay pending its appeal of Justice Kahn's order of March 27, 1986.

22. In addition to the state court matters involving the debtor and LSA, there is a pending arbitration proceeding commenced by LSA against the debtor on November 1, 1985, involving LSA's claim for additional rent and additional bonus rent under the Lease. This arbitration proceeding, conducted under the aegis of the American Arbitration Association, has been stayed because of the automatic stay imposed under 11 U.S.C. § 362(a).

23. On June 12, 1986, this court ruled that the state court default order in favor of LSA, which confirmed the landlord's termination of the debtor's leasehold interest in the Sparrowbush Apartments complex, and which was affirmed on appeal, was final and *res judicata* as to such termination. *In re Cohoes Industrial Terminal, Inc.*, 62 B.R. 369 (Bankr.S.D.N.Y. 1986), *aff'd* 70 B.R. 214 (S.D.N.Y.1986) *aff'd*. No. 87–5004 (2d Cir. Sept. 18, 1987). Therefore, the automatic stay imposed under 11 U.S.C. § 362(a) did not operate to enjoin LSA from enforcing its right of repossession.

24. On October 10, 1986, this court granted the United States trustee's motion for the appointment of a Chapter 11 trustee, partly as a result of the conflicts of interest of Leon Baker, Gloria Baker and the Coleman Trust, which they controlled. *In re Cohoes Industrial Terminal, Inc.*, 65 B.R. 918 (Bankr.S.D.N.Y.1986).

25. On February 6, 1987, this court dismissed the debtor's objection that all of LSA's claims arising out of the Lease were merged into the state court default judgment which upheld LSA's termination of the Sparrowbush Apartments lease. This court also ruled that LSA's claims for pre-termination contingent rent and waste and its post-petition claim for use and occupancy were not barred by the state court judgment which sustained LSA's termination of the Sparrowbush Apartments lease, nor did those claims reflect a splitting of the cause of action asserted by LSA which resulted in the state court judgment. *In re Cohoes Industrial Terminal, Inc.*, 69 B.R. 717 (Bankr.S.D.N.Y.1987), interlocutory appeal dismissed 75 B.R. 147 (S.D.N.Y.1987).

26. On May 15, 1987, Justice Daniel H. Prior, Jr. of the Supreme Court, State of New York, County of Albany, entered a decision granting summary judgment to LSA and its general partner, Aaron Kozak, in an action commenced against them by Gloria Baker, who claimed that the debtor, CIT, was her nominee and that she was the beneficial owner of the leasehold regarding Sparrowbush Apartments. The relevant Conclusions of Law in Justice Prior's decision are as follows:

\* \* \* \* \* \*

B. Legal title to the Leasehold belonged to CIT.

C. This Court cannot determine plaintiff's actual, if any, equitable interest in the Leasehold as between plaintiff and CIT, as CIT is not a party to this action, and any Findings and Conclusions herein relate only to the parties herein as between each other.

D. Defendants were *not* on notice that plaintiff claimed such equitable interest in CIT's legal interest in the Leasehold sufficient for defendants to have cause to believe that formal legal dealings with CIT would not adequately protect same.

E. Plaintiff Leon Baker and CIT went to great lengths to have title and ownership of the Leasehold appear to be in CIT and *not* be in plaintiff's name, and one purpose of said appearance was to convince the judiciary into believing and operating on the "fact" of CIT's sole ownership and on the "fact" that Gloria Baker did not own the Leasehold.

F. Plaintiff's allegations in the West. Co. Action were insufficient to require defendants to proceed differently in the Albany Action against CIT.

G. Plaintiff's relationship with CIT as it relates to defendants is, at best, an implied constructive trust [see *Levine v. Chussid*, 31 Misc.2d, 412, 221 N.Y.S.2d 311], the terms and conditions thereof oral and not a part of the public record and not known by defendants, and if written, maintained privately between plaintiff and CIT.

\* \* \* \* \* \*

O. Defendants are legal outsiders to any relationship between plaintiff and CIT.

\* \* \* \* \* \*

Q. Plaintiff has no independent standing to maintain this action and is a legal outsider as between defendants and CIT and their legal interest in the Leasehold and defendants were not privity to plaintiff's alleged equitable interest in the Leasehold.

R. Plaintiff is barred by Laches, Collateral Estoppel and Res Judicata.

\* \* \* \* \* \*

*Gloria Baker v. Latham Sparrowbush Associates and Aaron Kozak*, No. 01–86–006304, slip op. at 6 (N.Y.Sup.Ct. Albany County, May 15, 1987).

### WHO IS THE TENANT?

27. On November 12, 1973, Leon Baker, individually entered into a written agreement with Shaker Estates, Inc., which was then the tenant entitled to operate Sparrowbush Apartments, whereby Shaker Estates, Inc. agreed to assign its interest as tenant to Leon Baker. LSA, the owner of the property, was not a party to this agreement, nor was Leon Baker's wife, Gloria, a party to the contract. LSA believed that Leon Baker was going to assume the Sparrowbush lease in his individual capacity. However, at the closing with Shaker Estates, Inc. on December 31, 1973, which was not attended by anyone representing LSA, Leon Baker directed Shaker Estates, Inc. to make the assignment of its interest as tenant under the Sparrowbush lease directly to the debtor, CIT. This direction was contained in a written letter signed by Leon Baker, which Leon Baker delivered to Shaker Estates, Inc. at the closing date on December 31, 1973, and which reads in part as follows:

Pursuant to paragraph 9 I hereby designate Cohoes Industrial Terminal, Inc. as my designee to which you are to assign the lease referred to in the agreement. Please make the assignment directly to Cohoes Industrial Terminal, Inc.

[Exhibit LL]. Additionally, Leon Baker signed a letter dated December 31, 1973, addressed to the debtor, CIT, wherein he stated:

I hereby assign to you my interest as purchaser of the agreement for sale of leasehold dated November 12, 1973 with Shaker Estates, Inc.

[Exhibit KK].

28. Shaker Estates, Inc. assigned its interest as tenant of Sparrowbush Apartments to the debtor, CIT, on December 31, 1973. The assignment and assumption agreement was signed by William J. Magee as executive vice president of CIT. [Ex. D] Gloria Baker did not attend the closing and did not sign any documents at that time indicating that she had any interest in the leasehold. At the closing, CIT, by William Magee, issued nine promissory notes for a total of $100,000.00. [Ex. QQ]. The Coleman Trust, of which Leon and Gloria Baker were the sole trustees and beneficiaries, made the largest contribution for the debtor's acquisition of the leasehold interests, for which it received a wrap-around mortgage in the sum of $205,000. [Ex. SS]

29. The closing agenda [Ex. TT] reflects that all of the checks issued for the debtor's acquisition of the leasehold interest in Sparrowbush Apartments were signed by Leon Baker as follows:

$99,000 to Shaker Estates, Inc. from Leon Baker's escrow account.

$38,000 to the Coleman Trust for interest.

$ 2,916.67 to LSA.

$13,125 to mortgagee

$ 5,000 for tax escrow.

There were no checks signed by Gloria Baker nor was there any credible proof that any of her funds were used to pay for the acquisition, other than the fact that she

maintained a joint checking account with her husband, Leon Baker.

30. Pursuant to a letter addressed to LSA dated December 31, 1973 and signed by Leon Baker, LSA was informed that Shaker Estates, Inc. "has assigned its leasehold to Gloria Baker, doing business as Sparrowbush Apartments." [Exhibit # 2]. This statement was not factually correct because there was never any assignment of the Sparrowbush leasehold from the debtor to Gloria Baker. Although Leon Baker later claimed that Gloria Baker became the true owner of the leasehold interest and that the debtor took title to the tenancy as her nominee, it is clear that the lease was assigned to the debtor, as the designee of Leon Baker, pursuant to his letter to Shaker Estates, Inc., dated December 31, 1973. [Exhibit LL].

31. In view of the fact that LSA did not attend the closing on December 31, 1973, when Shaker Estates, Inc. assigned its leasehold interest to the debtor, LSA assumed the correctness of Leon Baker's letter dated, December 31, 1973, in which he informed LSA that the debtor had assigned its leasehold to Gloria Baker [Exhibit # 2]. Accordingly, Samuel Schwartz, a partner in LSA, replied to Leon Baker in a letter dated January 2, 1974, stating in part:

We have received your transfer of the lease to Gloria Baker and have noted same on our records.

[Exhibit # 3].

32. Having assumed that Leon Baker received the assignment of the Sparrowbush lease from Shaker Estates, Inc. and then assigned his interest to Gloria Baker, LSA's attorney, Pincus Cashman, objected in a letter dated January 16, 1975, addressed to Leon and Gloria Baker and Shaker Estates, when he learned that the lease had actually been assigned to the corporate debtor. Mr. Cashman concluded that Leon Baker, as the first assignee, and also Gloria Baker, as the second assignee, were personally liable for the performance of the terms and conditions of the Sparrowbush lease, rather than the corporate debtor, especially since LSA did not consent to

the corporate debtor's assumption of the lease. Mr. Cashman said:

The Landlord assumed that the lease had been assigned pursuant to the aforesaid Landlord's consent to Leon Baker.

I informed my client when asked for its opinion, that the Assignment by Leon C. Baker to Gloria Baker was in violation of the aforementioned Escrow Consent, but that having accepted the check of Leon C. Baker for January rent that in my opinion, Leon C. Baker as first and proper Assignee was personally liable as Assignee Tenant together with Gloria Baker as Second Assignee Tenant for the performance of the terms and conditions of the lease to its maturity date.

[Exhibit # 4].

33. Although Leon Baker and the debtor now take the position that Gloria Baker was the true tenant of the Sparrowbush leasehold, and therefore assumed full personal responsibility for the performance of the lease and that the debtor was merely her nominee, with no liability, this is not the position that Leon Baker took in response to Mr. Cashman's letter of January 16, 1974. He disclaimed any personal liability on his part or that of Gloria Baker because the assignment of the lease had been made to the corporate debtor. This disclaimer of personal liability was expressed by Leon Baker in his letter to Mr. Cashman, dated January 22, 1974 as follows:

In your letter you state that you have given your opinion that Gloria Baker and I have become personally liable on the lease. I take it that you gave that opinion before you learned that the *assignment had been made to Cohoes Industrial Terminal, Inc. Please be advised that in any event I do not concur in your opinion.*

(Emphasis added). [Exhibit MM].

34. Accordingly, regardless of whatever special arrangements Leon Baker, Gloria Baker and the debtor made privately between themselves, there is no question that Leon Baker did not disclose to LSA or its attorney as late of January 22, 1974, that Gloria Baker had assumed full personal

responsibility for the performance of the Sparrowbush lease and that the corporate debtor was merely her nominee which held title to the leasehold interest without having assumed responsibility for the performance of the lease. On the contrary, Leon Baker denied any personal liability for himself or Gloria Baker and pointed to the fact that the lease had been assigned to the corporate debtor. Manifestly, Gloria Baker was not a disclosed principal.

35. At the trial, William Magee, the executive vice president of the debtor, produced from his file a letter dated December 31, 1973 which he signed on behalf of the debtor addressed to Gloria Baker at her residence in Scarsdale, New York, stating:

> We hereby acknowledge that we are holding title to the leasehold of Sparrowbush Apartments as your nominee and that we have no beneficial interest in said leasehold.

[Exhibit 1A]. There was no evidence that a copy of this self-serving letter was ever sent to LSA or given to Shaker Estates, Inc. LSA denies that it ever received a copy of Mr. Magee's letter. The party claiming that it is an agent has the burden of proving it; the self-serving statement of the purported agent is insufficient. *La Societe Nationale v. Shaheen Natural Resources*, 585 F.Supp. 57 at 62 (S.D.N.Y. 1983) *aff'd* 733 F.2d 260 (2d Cir.1984) *cert. den.* 469 U.S. 883, 105 S.Ct. 251, 83 L.Ed.2d 188 (1984). *See* 2 S. Williston, A Treatise on the Law of Contracts § 295 at 374 (3d ed. 1959).

36. On January 25, 1974, a certificate of doing business was filed with the clerk in Albany County, New York in the name of Gloria Baker, doing business as Sparrowbush Apartments. Three bank accounts were opened in the name of Gloria Baker, doing business as Sparrowbush Apartments. Gloria Baker signed checks for two of the accounts; William Magee signed checks for the third account. Mr. Magee also obtained insurance for the premises in the name of Gloria Baker doing business as Sparrowbush Apartments. The accounting records were maintained by Dominick D'Ambrozio, a CPA, who also prepared financial statements for submission to LSA. Mr. Magee kept the payroll accounts and managed the premises of Sparrowbush Apartments as well as the industrial terminal which the debtor previously leased in Cohoes, New York. In fact Leon Baker viewed Cohoes and Sparrowbush as a single operation which was losing money and causing Leon Baker to tighten his belt, as distinguished from Gloria Baker's claimed financial interest in Sparrowbush Apartments. This point was expressed by Leon Baker in his August 30, 1976 letter to William Magee, which reads in part as follows:

> As you are aware, *I view Cohoes and Sparrowbush as a single operation which is losing money.* Instead of thinking of new expenditures, you should be concentrating on eliminating every needless expense.
>
> \*    \*    \*    \*    \*    \*
>
> *Sparrowbush was purchased on your recommendation and it is up to you to make it work.* If you made a mistake, you cannot expect *me* to do all the belt tightening while you continue business as usual.
>
> Sincerely, yours,
>
> s/ Leon
>
> Leon C. Baker

(Emphasis added). [Exhibit CC]. Although Mr. Magee is the executive vice president of the debtor, Gloria Baker testified that he was her employee as well, and that he managed Sparrowbush Apartments for her. Magee testified that he prepared checks for her signature which he submitted together with invoices for the expenditures. [Ex. 37 A–T] The income and expense deductions arising out of the operations of Sparrowbush Apartments were reported by Gloria Baker on the joint income tax returns which she filed with her husband, Leon Baker. This information was taken from the Schedule C federal income tax forms prepared for Gloria Baker by Dominick D'Ambrozio, the accountant who kept the books for Sparrowbush Apartments. [Ex. T 53].

37. In August of 1975, the debtor was unable to meet its rent and mortgage pay-

ments. LSA cooperated in assisting the debtor to obtain concessions from the mortgagee bank, with the result that a settlement agreement and amendment of lease were also arrived at between the debtor and LSA regarding the debtor's agreement to pay an additional bonus rent and additional contingent rent. The settlement agreement and amendment of lease were signed by Leon Baker on behalf of the debtor and by Aaron Kozak on behalf of LSA [Exhibit # 23]. The agreements specifically state that the debtor succeeded to the tenant's interest (Shaker Estates, Inc.) under the lease. There was no reference or indication in the 1975 amendment that Gloria Baker had any interest in the Sparrowbush Apartments lease.

### THE KAMIKAZE DEFENSE FAILS: GLORIA BAKER IS NOT THE TENANT

38. Originally, the debtor asserted as a defense that it could not be liable to LSA because the debtor was allegedly a nominee and agent of Gloria Baker, as a disclosed principal. This court characterized this objection as a kamikaze defense because, if successful, the debtor would be required to turn over to Gloria Baker the $350,000 lease termination fee that LSA was required to pay to the tenant for the right to exercise the termination option in the lease. *In re Cohoes Industrial Terminal, Inc.,* 69 B.R. at 719–21. Gloria Baker has since assigned any right she might have to this $350,000 payment to the Chapter 11 trustee, who then reasserted the so-called kamikaze defense that Gloria Baker is really the tenant and that LSA should assert its claims against her and not against the debtor CIT.

39. When all of the facts are viewed collectively, it is manifest that Gloria Baker was merely a figurehead. The Sparrowbush Apartments lease was assigned to the debtor by the previous tenant, Shaker Estates, Inc. The debtor assumed all of the obligations under the lease. There was nothing in writing, signed by or from Gloria Baker, to establish the so-called nominee relationship and nothing was recorded with regard to her claim that she was the beneficial owner of the Sparrowbush Apartments lease. The filing of a certificate of doing business as Sparrowbush Apartments was simply a unilateral act and a necessary formality in order for Leon and Gloria Baker to claim the expenses from the Sparrowbush operations as a tax shelter deduction on their income tax returns. The preparation of expense checks and rent checks for Gloria Baker's signature was an additional necessary formality in furtherance of this tax shelter concept.

40. For all other intents and purposes, Gloria Baker was a phantom figure in connection with Sparrowbush Apartments. She never physically attended the closing when the debtor acquired the leasehold interest. There was no evidence that she ever communicated directly with LSA; Leon Baker did all the negotiating and communicating. There was no evidence that she ever set foot on the leased premises or ever dealt with any tenants. William Magee, who managed the apartments, was a full-time employee and executive vice president of the debtor. He also managed the debtor's industrial terminal in Cohoes, New York before it was evicted from its lease by the Baker-controlled Coleman Trust. As manager of the Sparrowbush Apartments, he permitted Sparrowbush income to be used to pay bills owed by the industrial terminal. Gloria Baker does not claim that the industrial terminal was also her nominee.

41. Gloria Baker's involvement with Sparrowbush Apartments was minimal and nominal. William Magee in his capacity as executive vice president of the debtor, CIT, signed the assignment of lease and the lease assumption agreements. He managed the property. At the closing, Leon Baker signed the the checks. The Coleman Trust furnished the funds for the debtor's acquisition of the leasehold interest. Dominick D'Ambrozio kept accounting records and Magee handled the payroll books. Leon Baker did all the negotiating and communicating with LSA and LSA dealt only with him. The 1975 settlement agreement between LSA and the debtor was signed by Leon Baker as president of

the debtor. The Amendment of the lease was signed by Leon Baker. The fact that Gloria Baker signed the rent checks payable to LSA does not detract from the finding that the debtor was the tenant, because she was an officer of the debtor. The rent checks bear the name Sparrowbush Apartments and the debtor's address in Cohoes, New York. [Exhibits # 50, 51]. Gloria Baker never claimed that she was personally liable for the debtor's obligations until after LSA terminated the debtor's lease. There is no evidence of any document signed by Gloria Baker reflecting her alleged interest as tenant under the Sparrowbush Apartments lease.

42. Obviously, if LSA, or any tenant, or any third party had sued Gloria Baker personally for any obligations or liabilities arising out of the Sparrowbush Apartments operations, the plaintiff would have been met with the legal defense that the corporate debtor, CIT, was liable as the named tenant in accordance with the original assignment and lease assumption agreements dated December 31, 1973 [Ex. D] and under the settlement agreement and amended lease dated August 27, 1975 [Ex. 23]. As Justice Daniel H. Prior, Jr. stated on May 15, 1987, in granting summary judgment in favor of LSA and Aaron Kozak against Gloria Baker in the New York Supreme Court when she sued as the beneficial owner of the Sparrowbush Apartments lease:

> Plaintiff Leon Baker and CIT went to great lengths to have title and ownership of the Leasehold appear to be in CIT and *not* be in plaintiff's name, and one purpose of said appearance was to convince the judiciary into believing and operating on the "fact" of CIT's sole ownership and on the "fact" that Gloria Baker did not own the Leasehold.

*Gloria Baker v. Latham Sparrowbush Associates*, No. 01–86–006304, slip op. at 6 (N.Y.Sup.Ct. Albany County, May 15, 1987).

43. The evidence at the trial amply reveals that the Baker-controlled debtor corporation, as the tenant under the lease with LSA, selected its own executive vice president, William Magee, to manage and maintain Sparrowbush Apartments. However, the debtor could just as easily have chosen Gloria Baker to manage Sparrowbush Apartments or, even less, to collect the rent from the tenants or, even if she did not perform these functions, the debtor could have selected Gloria Baker to pay LSA the rent obligation under its lease. Indeed, this is what actually occurred. Magee managed and maintained the premises and also collected the rent from the tenants. The checks were deposited in a bank account entitled "Gloria Baker doing business as Sparrowbush Apartments." Gloria Baker then signed checks which were prepared for her by Magee for the payment of expenses and for the payment of rent to LSA. Although she was secretary-treasurer of the debtor corporation, and this function would have been consistent with these duties, she could just as easily have performed these tasks as an individual entepreneur who was regarded by the Baker entities as engaged in an independent business enterprise.

44. Accordingly, the filing of a certificate on January 25, 1974, reciting that Gloria Baker was doing business as Sparrowbush Apartments and any notices that Leon Baker may have submitted to LSA or others after the closing when the debtor became the lessee of Sparrowbush Apartments, that Gloria Baker was doing business as Sparrowbush Apartments, were not a sufficient disclosure that she was the tenant.

45. Therefore, apart from LSA's objections to the kamikaze defense on grounds of *res judicata* and collateral estoppel, predicated upon previous decisions of the New York State courts and those of this court in this case, the court finds that the evidence fails to support the Chapter 11 trustee's position that LSA's claims for waste, contingent rent and use and occupancy are misdirected against the debtor. On the contrary, the debtor was the tenant in possession under the Sparrowbush Apartments lease. There is no credible evidence to prove that Gloria Baker appointed the debtor as her nominee to hold bare legal title to the leasehold and that

she holds a beneficial interest as the real tenant under the lease. Gloria Baker was not the beneficial tenant nor was she ever the tenant in actual or constructive possession of the Sparrowbush Apartments leasehold interest.

## NO LEASE REINSTATEMENT BY ACCEPTING RENT

46. On December 27, 1984, LSA gave the debtor sixty-days notice in writing pursuant to Article 32 of the lease, that the lease was to terminate effective sixty days thereafter. In affirming this court, Chief Judge Charles L. Brieant stated:

> Thus, the Debtor's interest in the apartment complex was entirely extinguished and its landlord-tenant relationship with LSA was cancelled as of February 25, 1985, for purposes of the automatic stay regardless of the Debtor's continued possession.

*In re Cohoes Industrial Terminal, Inc.,* 70 B.R. at 219–220, *aff'd* No. 87–5004 (2d Cir. Sept. 18, 1987).

47. However, the debtor did not vacate possession of the premises until the state court receiver took possession on March 28, 1986. During the period between March 1, 1985 and March 1, 1986, Gloria Baker continued to sign rent checks payable to LSA which recited the name Sparrowbush Apartments and the debtor's address in Cohoes, New York. There were twenty-five checks which were sent to LSA. [Ex. # 51]. Thirteen checks were each in the amount of $4166.67 and represented monthly fixed rent charges. The balance of the checks included mortgage amortization and interest assumed as part of the rent; these consisted of five checks in the sum of $10,-582.10 each, six checks in the sum of $7345.90 and one check for $2962.96. All of the checks were accepted and deposited by LSA in the total amount of $154,115.51.

48. Although LSA accepted the debtor's rent checks for the period following February 25, 1984 through March 28, 1986, there was no evidence of any express or implied agreement between LSA and the debtor with respect to the debtor's right of possession. At all times during this period LSA

disputed the debtor's possession. In its state court action, commenced against the debtor on February 13, 1985, LSA maintained that the debtor's tenancy terminated on February 25, 1985, which was sixty days following the service of LSA's notice of termination under Article 32 of the lease. Therefore, pursuant to Section 232–c of the New York Real Property Law, LSA's acceptance of the rent operated as a matter of law to create a holdover tenancy from month to month, commencing on March 1, 1985, and terminating on March 28, 1986, when the state court receiver took possession of the premises.

49. The debtor remained in possession of the premises after February 25, 1985 against LSA's will. Nonetheless, there was no reinstatement or resurrection of the terminated lease merely because LSA accepted rent checks from the debtor. The debtor's holdover status was created as a matter of law. The debtor's contention that the Sparrowbush Apartments lease was reinstated as a result of LSA's acceptance of rent is unsupportable. Indeed, the Second Circuit Court of Appeals affirming this court and the district court, said recently:

> We further agree that the Debtor's argument that subsequent lease payments reinstituted the lease after it terminated is *meritless.*

(Emphasis added). *Gloria Baker v. Latham Sparrowbush Associates (In re Cohoes Industrial Terminal, Inc.),* No. 87–5004, slip op. at 2 (2d Cir. September 18, 1987).

## ADDITIONAL CONTINGENT RENT—NOT TIME BARRED

50. In August of 1975, Leon Baker advised LSA that Sparrowbush Apartments was losing money and suggested that the $13,125.00 per month rent which the debtor paid to cover the mortgage obligation to the Manhattan Savings Bank should be reduced by lengthening the period of principal amortization. LSA cooperated with Leon Baker and convinced the Manhattan Savings Bank to reduce the monthly payment to $10,582.10. Aaron Kozak, the gen-

eral partner of LSA, agreed to go along with this reduction on condition that LSA be compensated for losing the benefit of the higher amortization of $13,125, which represented a monthly loss of $2542.90 in amortization, and a loss in interest, for a total of approximately $3000.00 per month. It was agreed that the debtor would pay an additional fixed rent of $1250 per month, commencing September 1, 1976. LSA and the debtor also agreed that as additional compensation to LSA because of the $3000 monthly reduction in mortgage amortization, the debtor would pay to LSA an additional $1350.00 per month, or $16,200 per year, in the event that the debtor achieved a break even cash flow. This conditional payment was called "additional contingent rent." This additional contingent rent would be paid by the debtor only if the annual cash flow from the leased premises, plus $1000 per month, equaled the original monthly mortgage amortization obligation of $13,125 multiplied by the number of months in the preceding year, minus the additional fixed rent paid during that period. No additional contingent rent need be paid by the debtor in any year in which it did not achieve a break even cash flow level.

51. Pursuant to the Amendment of Lease, entered into between the debtor and LSA on August 27, 1975 [Exhibit # 23], the period for calculating additional contingent rent commenced on September 1, 1975. The first payment was due on March 15 of each year commencing 1977. Based upon the figures submitted by the debtor, no additional contingent rent was due because the debtor operated at a deficit throughout the term of the lease. Accordingly, the debtor never paid any additional contingent rent to LSA.

52. In order to verify the correctness of the debtor's calculations with respect to additional contingent rent, the parties included a clause in the August 27, 1975 amendment which reads, in pertinent part, as follows:

*Computation of cash flow.* Tenant will deliver to landlord monthly statements of cash flow as prepared for tenant's use. Beginning in 1977, tenant will deliver to landlord on or before March 15 a detailed computation of cash flow through the end of the preceding lease year prepared by a certified public accountant. Said computations shall be conclusive and binding on landlord unless by July 20 following delivery thereof to landlord, landlord delivers to tenant notice specifying in detail all alleged errors and requesting arbitration with respect to such errors, in which event said statements and computations shall be conclusive and binding upon landlord only as to matters as to which no errors have been specified in said notice. If any points in dispute have not been resolved by July 20 following delivery of the statement or computation and if the parties do not extend the time, landlord may, by notice in writing delivered to tenant no later than July 31, submit the points remaining in dispute to the firm of Ernst & Ernst or in the event of their refusal or inability to act then to the first of the following certified public accounting firms which is willing to act as arbitrator:

53. Each year LSA was furnished with a statement of income with respect to Sparrowbush Aparatments, which was prepared by Dominick D'Ambrozio, CPA. The last statement submitted to LSA is dated March 15, 1985 and covers the twelve months ending December 31, 1984. [Exhibit # 15].

54. Aaron Kozak, as general partner of LSA, wrote to Leon Baker on February 1, 1985 requesting a time and place when LSA could continue its examination of the books and records of Sparrowbush Apartments from September 1, 1975 through December 31, 1985. In a letter to Leon Baker dated February 15, 1985, Aaron Kozak reiterated his request to examine the books of Sparrowbush Apartments for the period from September 1, 1975 through December 31, 1985. [Exhibit # 41].

55. LSA never disputed in writing any of the income statements of Sparrowbush Apartments prior to November 1, 1985, when LSA served its Notice of Intention to Arbitrate [Exhibit UUU]. Therefore, the

debtor relies on the language on page 4 of the lease amendment that its detailed computations of cash flow "shall be conclusive and binding on landlord" because by July 20 following such submission of cash flow computations the landlord did not deliver "to tenant notice specifying in detail all alleged errors and requesting arbitration with respect to such errors ...".

56. The debtor's reliance on the time constraints in the lease amendment or on the Statute of Limitations is misplaced because the debtor expressly extended in writing LSA's time to object to debtor's financial computations for additional contingent rent purposes. In a letter dated October 12, 1984, Leon Baker, as attorney and president of the debtor wrote to Aaron Kozak, LSA's general partner as follows:

This will confirm our agreement to extend your time to object to statements of deficit or net cash flow for Sparrowbush Apartments which I delivered to you. You wanted forever, which I thought was somewhat long. I hereby agree that your time is extended until December 31, 1985. If that is too short, let us talk about another extension around October 1, 1985.

[Exhibit TTT].

57. Leon Baker's agreement with LSA to extend the time for LSA to file objections to the Sparrowbush Apartments cash flow statements had the effect of preventing the interposition of the statute of limitations in any action or proceeding commenced before December 31, 1985.

58. On November 1, 1985, LSA served its Notice of Intention to Arbitrate its dispute under the Sparrowbush Apartments lease with respect to additional contingent rent. The statute of limitations on a claim submitted to arbitration stops running when a notice of intention to arbitrate is served. Therefore, the debtor's statute of limitations defense to LSA's claim for additional contingent rent must be dismissed; this issue must be determined on its merits.

## ADDITIONAL CONTINGENT RENT—AMOUNT

59. Mr. Arnold Toren, a certified public accountant and an associate of LSA, pre-

pared a report based upon the Sparrowbush Apartments' financial statements which were prepared by Dominick D'Ambrozio. [Exhibit # 55]. This report reflected adjustments claimed by LSA with respect to cash flow items from information obtained from the Schedule C reports prepared by D'Ambrozio for Sparrowbush Apartments. The starting point was the four-month statement prepared by D'Ambrozio for the period September 1, 1975 through December 31, 1975 [Exhibit # 67]. The basic conflict which gave rise to the adjustments and LSA's additional contingent rent claim is the fact that LSA contends that the term "cash flow" means cash flow from the operation of the real estate. LSA objects to any deductions taken by the debtor to finance the cost of the acquisition of the property, such as mortgage amortization and interest, management fees charged by the tenant, legal fees paid by the tenant, bills which were incurred by the debtor's industrial terminal in Cohoes but charged to Sparrowbush Apartments, wages to Gloria Baker and interest paid to the Coleman Trust. Based on these adjustments, LSA showed that the cumulative additional contingent rent due from 1980 to 1985 amounted to $162,391. [Exhibit # 55].

60. The court finds that Mr. Toren's accounting adjustments, as substantiated by LSA's expert accounting witness, Lewis Wolf, properly viewed "cash flow" as limited to the cash flow from the operation of Sparrowbush Apartments and is exclusive of the acquiring tenant's debt service. This depreciation and amortization are not cash charges, because a cash flow statement is free and clear cash flow, as if there were no debt on the property. Therefore, for the most part, the adjustments reflected on Exhibit # 55 are correct. The legal fees paid to Leon Baker are expressly proscribed under Article 10 §§ 10.01 and 10.03 of the August 28, 1968 lease. [Exhibit # 47]. However, the adjustment for so-called excessive insurance in the total sum of $12,000 is unwarranted. So too, the adjustments for real estate taxes accrued

prior to September 1975, but paid thereafter in the sum of $37,000, and the adjustment for expenses accrued prior to September 1975 but paid thereafter in the sum of $12,247 are improper. Therefore, the cumulative additional rent reflected on Exhibit # 55 should be reduced by the sum of $12,000, $37,000 and $12,247, with the result that LSA's claim for additional contingent rent is allowed in the total amount of $101,144.00.

## COVENANTS TO REPAIR AND MAINTAIN THE BUILDINGS

61. Article 9 of the August 28, 1968 Sparrowbush Apartments lease contains four sections which impose upon the tenant very broad obligations to maintain and repair the buildings and parking lots and to make any and all necessary structural and ordinary repairs and improvements. [Exhibit # 47]. The landlord is completely excused from any obligation to repair or maintain the leased premises and the tenant is required to assume full and sole responsibility for the operation, repair and maintenance of the leased premises. These provisions are expressed in the lease as follows:

SECTION 9.01. Throughout the term of this Lease, Tenant, at its sole cost and expense, will take good care of the Demised Premises, paint and maintain the same, and the personal property as herein defined and the sidewalks, curbs, parking areas, access roads, vaults and signs adjoining the Demised Premises and will keep the same in good order and condition, and make all necessary repairs thereto, interior and exterior, structural and non-structural, ordinary and extraordinary and unforeseen and foreseen. When used in this article, the term "repairs" shall include all necessary replacements, renewals, alteration, additions and betterments. All replacements required under this article, of personal property shall be made by Tenant but said replacements or repairs shall become the property of the Landlord. All repairs and replacements made by Tenant shall be equal in quality and class to the original work. Tenant will do or

cause others to do all necessary shoring of foundations and walls of the Building and every other act or thing for the safety and preservation thereof which may be necessary by reason of any excavation or other building operation upon any adjoining property or street, alley or passageway.

SECTION 9.02. The necessity for and adequacy of repairs pursuant to Section 9.01 hereof shall be measured by the standard which is appropriate for buildings of similar construction and class, provided that tenant shall in any event make all repairs necessary to avoid any structural damage or injury to the Demised Premises and to keep the premises in a rentable condition.

SECTION 9.03. Tenant shall put, keep and maintain all portions of the Demised Premises and the sidewalks, parking areas, curbs, access roads, passageways and signs, adjoining the same in a clean and orderly condition, free of dirt, rubbish, snow, ice and unlawful obstructions.

SECTION 9.04. Landlord shall not be required to furnish any services or facilities or to make any repairs or alterations in or to the Demised Premises. Tenant hereby assumes the full and sole responsibility for the condition, operation, repair, replacement, maintenance and management of the Demised Premises.

62. The Sparrowbush Apartments lease also contains a surrender clause with the following terms:

Section 6.01. Tenant shall and will on the last day of the term hereof, or if the option periods be effective, on the last day of said option periods, or upon any earlier termination of this Lease, or upon any re-entry by Landlord upon the Demised Premises pursuant to Article 21 hereof, well and truly surrender and deliver up the Demised Premises, including the personal property as herein defined, into the possession and use of Landlord without fraud or delay and in good order, condition and repair, reasonable wear and tear excepted, and free and clear of all liens and encumbrances other than

those, if any, created pursuant to the provisions hereof.

63. In Section 10.01 of the Sparrowbush Apartments lease the tenant is required, at its sole cost and expense, to comply with all municipal governmental laws and regulations with respect to the manner or use of the demised premises whether or not such laws require structural changes or improvements.

### CONDITION OF THE PREMISES

64. The debtor's vice president, William Magee, testified that the Sparrowbush Apartments complex, which consists of eleven two-story garden apartment buildings and includes one hundred and forty-four apartments, suffered from poor structural design and construction. It had a severe drainage problem because the inverse grading pitched towards the buildings, with the result that melting snow and rain poured down the grade into the basements of the buildings. The poor drainage also caused eroding of basement stairwells and sidewalks and caused ponding of water in the parking lots, which resulted in the formation of pot holes.

65. Magee said that at times raw sewage spilled out on basement floors due to back-ups in sewer lines. Sump pumps were used to clear the basement floors and bleach was poured on the floor to eliminate the odor caused by excrement from the backed-up sewer lines. The sewer lines were repaired by wrapping the holes with duck tape. He said there were a few instances of air conditioning leakages from apartments above to the apartments below.

66. Leaking windows were repaired by installing triple track storms and screens at a cost of $28,000. Two above-ground transformers were installed because of the flooded basements. Beams in the basements, many of which were rotted at the ends due to exposure to moisture, were reinforced with angle irons and lally columns in order to take the pressure off the walls. Magee said that some stairwells into the basements lacked hand rails. The concrete steps were eroded due to rain. Most of the basement doors were operable, although some doors had been vandalized. Painting was performed on a five year cycle. The debtor was in the fourth year of this cycle when the state court receiver took possession of the premises on March 28, 1986.

67. Magee said that some apartments had sagging floors which caused the baseboards to separate from the floors. He said that this condition was remedied by simply dropping the baseboards to cover the gaps, which were then no longer noticeable. He testified that there were seventy-two apartments with overhead porches and that he had replaced six porches. Magee said he only had one problem with a leaking roof and he replaced one hundred square feet of shingles and some flashing. He never had to replace doorbells or windows. He did not repair the rear parking lot because the tenants preferred to park in front of the buildings, since there were no doors to the back. Magee testified that Sparrowbush Apartments had little tenant turnover because the rent was kept reasonably low. Only two apartments needed attention when the receiver took possession. By keeping the rent low, management was able to cut the expense of preparing apartments for new tenants, because the current tenants did not move out often. He did not sand any floors because he said that sanding would weaken the floors and cause nails to show.

68. Joseph Ropelewski, a maintenance man employed by Sparrowbush Apartments, testified that tenants complained about the smell in the basements caused by leaking sewer pipes. He said he made no repairs other than when a tenant complained. He made no repairs of stairs or wood building fronts nor did he repair any parking lots. Ropelewski said that he fixed sewer back-ups by breaking holes in the sewer pipes and then snaking out the blockage, after which he covered the holes with duck tapes.

69. The debtor's engineering witness, Mr. Russ Reeves, testified that the Sparrowbush buildings had always failed to satisfy the local building code requirements. He confirmed that the poor grading adja-

cent to the buildings caused water to run off into the basements. This condition caused the timber beams, which were undersized for the load involved, to rot at the ends. This problem was further aggravated by the lack of foundation drains and the absence of roof gutters or down spouts. He testified that some beams were twisted, due to stress and that a gap in the floor in an apartment would signify a weakness in the bearing beams below. He recommended that the rotted beams be replaced.

70. LSA's engineer, Richard Pikul, first examined Sparrowbush Apartments on March 12, 1985, two weeks before the debtor surrendered possession of the premises to the state court receiver. After detailing specific problem areas and commenting as to buildings numbered three, five, ten, eleven and the office building, Pikul stated the following conclusions and recommendations:

*Conclusions/Recommendations*

As noted, there are numerous instances of problem areas that need correction. The more serious problem (i.e. bearing beam deterioration) requires replacement and/or reinforcement of bearing beam timbers plus elimination of the source of moisture. Due to building settlements resulting from the loss of bearing, many areas will require temporary jacking up to relevel floors prior to installation of new beams or repair of existing. The source of moisture appears to be due to inadequate surface drainage resulting in ponding of water against the foundation walls. Correction of the drainage problem and sealing/caulking of cracks should result in major improvements in this situation.

Brick veneer deterioration due to splashing water and freeze thaw cycles, will require replacement of brick units, repointing and correction of drainage. Installation of gutters and downspouts should improve this condition. Loose stone splash pads may help reduce this problem as well.

Basement stairs need to be resurfaced/replaced and missing safety rails need to be installed. To prevent ice and snow build up, consideration should be given to roofing and stair areas, or covering them and installing cellar way metal enclosures over the steps. Drains in the lower platform areas would assist in preventing water entry under basement doors.

Severely cracked wall areas with associated exterior grade depressions need to be sealed and possibly reinforced. Grade depressions obviously need to be filled and graded to drain away from the structures.

Painting and caulking should be done as soon as weather permits. Extensive surface preparation and priming will be required before a final coat is applied.

Attic areas were not investigated during this field visit so conditions could not be assessed.

Electrical, mechanical and plumbing systems were not part of this investigation.

[Exhibit # 31].

71. Pikul made a second visit to Sparrowbush Apartments in early April of 1985 and inspected buildings numbered four and ten. The basement in building ten was flooded and dark causing him to slip in a sump pump hole and lose his flashlight. Building four smelled of raw sewage. Pikul's third visit was in September of 1986, after the state court receiver took over. The cellars were lit and cleared of debris. He was able to walk in the basements and inspect the deterioration without a water problem preventing his access. Thereafter, in January of 1987, Pikul visited the premises twice and inspected the attic in building ten and the basements in other buildings. He observed some roofs had sags, bearing beams in the basements were overloaded by more than three and one-half times their capacity. Steel angles that were used to bolster sagging beams had twisted through some beams. He described the shoring up of the beams as emergency type measures. In some instances the work had been performed in an unworkmanlike manner and was of dubious value. The beams which were twisted and crushed needed additional shoring. Some supports had rotted and some beams sim-

ply rested on concrete walls. Pikul also said that there were insufficient posts. He concluded that the only way to solve the problem is to regrade the site, because the inadequacy of the beams relates to the original construction, which resulted in the run off of water into the basements.

72. LSA also presented James Burns as a witness. Burns is the president of a management corporation which manages and operates apartment houses and condominiums in northern New York. He visited Sparrowbush Apartments in 1985 when he heard that the property might be for sale. He said that the premises lacked curb appeal and did not look well groomed. The lawns were not cut, the landscaping was not trimmed, the parking lots were not painted with stripes for parking spaces and debris was strewn about. He said that the premises were poorly maintained. He noticed curling shingles on the roofs and said that the roofs needed repairs.

73. Burns also observed that the beams in the basement were undersized and forced the supporting lally columns to be driven into the floors. He testified that someone must have recognized the lack of support as a problem, but that the repairs were totally inadequate. He saw spalling of the concrete on the sidewalks. Burns visited four buildings and noticed crooked walls and doors coming off their hinges.

74. Burns concluded that Sparrowbush Apartments were neglected and poorly maintained; the level of maintenance was totally inadequate. He said that he would never consider breaking a sewer pipe to clear a blockage, nor would he use duck tape to cover holes in the pipe; this was not proper maintenance. Burns testified that he would be concerned about the health and safety of the tenants because of the rotting beams and the failing lally columns, which created the danger of falling and causing floors to collapse. He said that he would not regard the buildings as habitable and would not let a tenant live there under these conditions. Burns said that a policy of keeping rent low in order to save refurnishing is irrational and is a strategy with which he disagreed.

75. Michael Szomjassy, the president of Mardoc Construction Consultants and Appraisers, with forty-five years of experience in the construction business, testified for LSA on the issue of damages and repair costs. He first visited the premises on July 7, 1986, which was more than three months after the state court receiver took possession of Sparrowbush Apartments. Based on his inspection, Szomjassy submitted a preliminary report to LSA dated October 6, 1986, which called for repairs totalling $1,305,700.00, [Exhibit # 33]. The structural repairs covered in this report were based upon the recommendations made by Joseph Pikul. Szomjassy spent approximately 95 hours at Sparrowbush Apartments and approximately 100 hours off the site in preparing his report. He later submitted to LSA his final report and estimate, dated July 28, 1987, which called for a repair cost for Sparrowbush Apartments of $1,460,165.00. [Exhibit HHH].

76. The items listed in Szomjassy's final report refer to substantially the same conditions, deterioration and needed repairs that were observed by Joseph Pikul and James Burns when they visited Sparrowbush Apartments before the state court receiver took possession. The structural repairs itemized on page 2 of Szomjassy's final report, dealing with the repairing of beams and joists, at a cost of $336,765, are required of the tenant under the repair clause in the lease. These items are therefore allowed.

77. The work required to maintain the structural integrity of the premises and to perform the sitework listed on page 3 of Szomjassy's final report, dealing with walls, roof eaves, regrading, patching cracks in walls, replacing defective porches and walks, concrete topping on some walks, repair of handrails and areaway handrails, for a total cost of $145,000 is both necessary and allowable.

78. The general repairs itemized on page 4 of the Szomjassy's final report, dealing with cleaning debris from the basements, areaways, windowells, installing windows, sump pumps, repairing holes in sewer lines, releveling sewer lines, replac-

ing rotted wood, resurfacing areaways at a cost of $37,810 have been established as necessary and proper.

79. On page 5 of Szomjassy's final report, calling for repairs to porches, roofs, doors, spalled bricks, exterior wood fascias, soffits, sills and painting of exterior trim, most of the items are appropriate. However, certain items have not been established. Pikul, in his report dated March 14, 1985 [Exhibit # 31] noted that the window frames appeared weathered and required repainting. He did not conclude that the windows should be replaced. Therefore, the cost of removing and replacing windows and frames in the sum of $50,440, will not be allowed. The need for the removal and replacement of window sashes, at a cost of $40,180, has not been established. The nonworking door bells, at a cost to repair in the sum of $1200, the missing door numbers to apartments, costing $120 and the missing door numbers to buildings, costing $420, are items which had not been mentioned by any of the witnesses who visited the premises before the state court receiver took possession. It is conceivable that these missing items totalling $92,160, are attributable to periods for which the debtor should not be responsible. Accordingly, these disallowed sums shall be deducted from the sum of $304,250 for all of the items on page 5 of Szomjassy's final report, which results in a total of $212,090 which has been established by LSA.

80. With one exception, the items listed on pages 6 and 7 of Szomjassy's final report all relate to ordinary wear and tear in the tenants' apartments of the type that would require attention after a tenant moves out. These items include interior doors, locks, knobs, rehanging sliding doors, broken glass shower doors, caulking around shower doors, adjusting kitchen cabinets, replacing kitchen tiles, broken glass, sanding wooden floors, painting apartments, repairing electrical outlets, and replacing porch lights. There was no evidence that William Magee or any of the people he supervised were aware of these items or that any tenant requested that they be repaired. These are items which the Sparrowbush maintenance people could have remedied if called to their attention. There was no proof that any tenant requested this work to be done. Accordingly, with one exception, they will be disallowed. The repair of buckled floors, at a cost of $4,050 is required and is a condition that was known to Magee. Therefore, this item has been established by LSA, and will be allowed.

81. The debtor's witness for construction items, Daniel Estep, did not have sufficient knowledge of specific conditions at Sparrowbush Apartments to refute Szomjassy's evidence as to the needed repairs and their cost. His knowledge of Sparrowbush Apartments was based upon his driving past the buildings in his car on the way to work over a period of twenty years. He was asked by the debtor to visit the premises in July of 1987, at which time he spent one hour and one-half at the site. Estep's conclusion that another construction firm would do the work described by Szomjassy for sixty percent of Szomjassy's estimate, lacks any foundation and is not credible.

82. In sum, LSA has established that the debtor has failed to repair and maintain the Sparrowbush Apartments in accordance with its obligations under the lease dated August 28, 1968, [Exhibit # 47]. LSA has also established that the reasonable cost to make the repairs for which the debtor is obligated is the sum of $336,765, to make structural repairs; $145,000 toward repairs to maintain the structural integrity of the premises; $37,810 for general repairs; $212,090 for exterior and interior repairs; and $4,050 to repair buckled floors, for a total of $735,715.00.

## DISCUSSION

### THE PHANTOM TENANT

The proof reveals that as late of January 22, 1974, neither Gloria Baker, nor anyone acting on her behalf, ever disclosed to the landlord, LSA, or to Shaker Estates, Inc., that Gloria Baker designated the debtor corporation, CIT, to take title to the leasehold on December 31, 1973 by assignment from Shaker Estates, Inc. as her nom-

inee and that she was the true beneficial owner of the leasehold and personally responsible for the performance of the terms and conditions of the Sparrowbush Apartments lease. Indeed, the evidence establishes that her husband, Leon Baker, had contracted with Shaker Estates, Inc. to purchase the Sparrowbush Apartments lease and that at the closing on December 31, 1973, which Gloria Baker did not attend, he delivered a written designation to Shaker Estates, Inc. designating the debtor, CIT, as his "designee to which you are to assign the lease referred to in the agreement. Please make the assignment directly to Cohoes Industrial Terminal, Inc.". LSA, as the landlord of the premises, also did not attend the assignment transaction between the then tenant, Shaker Estates, Inc. and the debtor. Having been incorrectly informed by Leon Baker that the debtor had then assigned its leasehold interest to Gloria Baker, LSA's attorney wrote to Leon Baker on January 16, 1975, stating that it was LSA's position that both Leon Baker and Gloria Baker were personally liable under the lease as first assignee and second assignee respectively. In a written reply dated January 22, 1974, Leon Baker, as attorney for himself, his wife, Gloria Baker, and the debtor, CIT, denied that either he or Gloria Baker had any personal liability under the lease and informed LSA's attorney, Mr. Cashman, that Cashman's opinion as to personal liability must have been given "before you learned that the assignment had been made to Cohoes Industrial Terminal, Inc." As stated by Justice Daniel H. Prior, Jr. in his decision dated May 15, 1987 in the New York Supreme Court action brought by Gloria Baker against LSA and its general partner, Aaron Kozak, which was brought by Gloria Baker on the ground that she was the true tenant of the Sparrowbush Apartments lease:

"Plaintiff Leon Baker and CIT went to great lengths to have title and ownership of the Leasehold appear to be in CIT and *not* be in in plaintiff's name, and one purpose of said appearance was to convince the judiciary into believing and operating on the "fact" of CIT's sole ownership and on the "fact" that Gloria Baker did not own the Leasehold."

*Gloria Baker v. Latham Sparrowbush Associates and Aaron Kozak*, No. 01–86–006304, slip op. at 6 (N.Y.Sup.Ct. Albany County, 1987).

Gloria Baker's failure to disclose at the time of the lease assignment to the debtor on December 31, 1973 that she claimed to be the assignee of the Sparrowbush Apartments lease and that the debtor received title to the leasehold as her nominee, is fatal to the debtor's position in this case that Gloria Baker is the tenant under the Sparrowbush Apartments lease and that the landlord's claim for damages, which was filed against the debtor, should be expunged.

At this day the law must be considered as settled, that a vendor or purchaser dealing in his own name, without disclosing the name of his principal, is personally bound by his contract, and it makes no difference that he is known to the other party to be an auctioneer, or broker, who is usually employed in selling property as the agent for others. *Even where he disclosed the name of his principal, if he signs a written contract in his own name merely, which contract does not upon its face show that he was acting as the agent of another, or in an official capacity in behalf of the government, he will be personally bound thereby.*

*Meyer v. Redmond*, 205 N.Y. 478 at 483, 98 N.E. 906 (1912). Hence, knowledge of the principal is the crucial point, and this requires actual knowledge, not suspicion. *Ell Dee Clothing Co. v. Marsh*, 247 N.Y. 392 at 397, 160 N.E. 651 (1928); *Special Sections, Inc. v. Rappaport Company*, 25 A.D.2d 896, 269 N.Y.S.2d 319 (App.Div. 3d Dep't.1966); *Rafner v. Toplis & Harding, Inc.*, 25 A.D.2d 826, 269 N.Y.S.2d 661 (App. Div. 1st Dep't.1966). In order to avoid liability as a principal, the agent must disclose the existence of the representative capacity at the time the contract is made, because disclosure of the fact after the contract is made will not relieve the agent from liability. *Ardwin v. Englert*, 81

A.D.2d 960, 961, 439 N.Y.S.2d 720, 721 (App.Div. 3d Dep't.1981) *aff'd* 56 N.Y.2d 936, 439 N.E.2d 324, 453 N.Y.S.2d 608 (1982); *Unger v. Travel Arrangements, Inc.*, 25 A.D.2d 40, 47, 266 N.Y.S.2d 715, 723 (App.Div. 1st Dep't.1966). *See* Restatement (Second) of Agency §§ 4, 321, 322 (1957).

In the instant case when the debtor acquired title to the leasehold from Shaker Estates, Inc. on December 31, 1973, it did not, nor did anyone acting for the debtor or Gloria Baker, disclose that the debtor was only an agent and that Gloria Baker was the principal. Hence, the debtor is liable to LSA for the performance under the lease without regard to Gloria Baker's subsequent position that she assumed responsibility for performance under the assigned Sparrowbush Apartments lease.

## CLAIM PRECLUSION

The debtor has raised various affirmative defenses, all related to Justice Kahn's order and default judgment entered in the New York Supreme Court, Albany County on April 18, 1985. This order and judgment held that the termination provision in Article 32 of the Sparrowbush Apartments lease was valid and directed the debtor to deliver possession of the premises to LSA in exchange for the $350,000 termination payment called for under the lease. The debtor now contends that LSA may not now claim the additional contingent rent provided for in the 1975 amended lease, or damages for waste or the reasonable value of the debtor's use and occupation after the lease was terminated.

## 1. SPLITTING A CAUSE OF ACTION

█ The rule against splitting of causes of action comes into play when the claims are single, entire and indivisible, because the rule was intended to prevent vexatious and oppressive litigations. *Kennedy v. City of New York*, 196 N.Y. 19, 89 N.E. 360 (1909) (a claim against a holdover tenant is a separate claim); *White v. Adler* 289 N.Y. 34, 43 N.E.2d 798 (1942); *City of New York v. Loomis*, 199 Misc. 915, 101 N.Y. S.2d 16 (1950). Thus, when a landlord

brings an action against a tenant for eviction and for past due rent and obtains a judgment, the landlord may not thereafter sue for earlier rent that was due at the commencement of the first suit. *Haviland & Co. v. Sphinx Import Co.*, 55 Misc.2d 448, 285 N.Y.S.2d 414 (Civ.Ct.N.Y.Co.1967).

This court has previously ruled in this case that LSA's claim for contingent rent and waste through February 25, 1985, or its claim for use and occupancy after such date were separate causes of action which were not implicated in LSA's suit for a declaratory judgment that the lease termination clause was valid and effective. *In re Cohoes Industrial Terminal, Inc.*, 69 B.R. 717 (Bankr.S.D.N.Y.1987). In dismissing the debtor's interlocutory appeal, District Court Judge Gerard L. Goettel said:

LSA's first action, to exercise the lease's termination option, would not appear to be sufficiently related in time, space, origin, or motivation to LSA's present claims for contingent rent, additional bonus rent, waste and post-termination use and occupancy of the leased premises to constitute a split cause of action.

75 B.R. 147 (S.D.N.Y.1987).

*In Maflo Holding Corp. v. S.J. Blume, Inc.*, 308 N.Y. 570, 127 N.E.2d 558 (1950), the New York Court of Appeals ruled that the dismissal of a landlord's suit for damages caused by the tenant's failure to comply with a right of access to the premises, did not preclude the landlord from suing for attorneys fees and expenses provided for in a clause in the lease as additional rent which the landlord incurred as a result of the tenant's failure to comply with the landlord's right of access to make repairs. The court said:

Although the evidence which proves the breach of the lease as to failure to allow access, would be the same in both causes of action, evidence of the defendant's refusal to pay the additional rent provided for by the lease would demonstrate that there was a violation of two rights by two distinct legal wrongs.

308 N.Y. at 576, 127 N.E.2d 558.

This court reiterates its previous ruling that there was no splitting of a cause of

action because LSA's claim for additional contingent rent, damages for waste and its claim for use and occupancy are separate and independent of LSA's rights under the termination clause in Article 32 of the lease.

### 2. RES JUDICATA AND MERGER BY JUDGMENT

Having concluded that LSA's action for a declaratory judgment as to the validity of the termination clause in the lease was a distinct cause of action separate and independent of its proof of claim for additional contingent rent, waste and use and occupancy, it follows that the state court default judgment terminating the lease is not *res judicata* as to LSA's proof of claim, nor is such claim barred by the doctrine of merger by judgment. LSA's state court judgment is not conclusive as to a different cause of action.

> Although only one action may be maintained for a total breach of an entire contract, different causes of action may spring from the same contract, and in such case a judgment on one is not a bar to a suit on the other.

3 Carmody Waite 2d, Cyclopedia of New York Practice § 16:10.

The concept of *res judicata* or merger by judgment is based on the principle that there should not be more than a single suit for a single cause of action in order to prevent vexatious litigation and wasteful dissipation of judicial energies. *See* 5 New York Civil Practice, Weinstein, Korn & Miller, ¶ 5011.15.

The debtor's affirmative defenses of *res judicata* and merger by judgment must fall because LSA did not split a cause of action that was previously adjudicated when it filed a proof of claim in this case for additional contingent rent, waste and use and occupancy.

### 3. MERGER OF CLAIMS FOLLOWING REAL ESTATE CLOSING

■ The debtor has interposed as an affirmative defense to LSA's claims that all antecedent claims arising out of the Sparrowbush Apartments lease were waived when LSA completed the exercise of its purchase option in Article 32 of the lease without any agreement or reservation that its claims would survive its acceptance of the $350,000 termination payment. The debtor reasons that under New York law the acceptance of a conveyance of an interest in real estate constitutes a waiver of all claims with respect to the real estate except any claims expressly reserved by the parties at the closing. Hence, the debtor maintains that the lease became the contract of sale when LSA exercised its option to purchase the leasehold pursuant to Article 32 of the lease. As viewed by the debtor, the default judgment entered in the New York Supreme Court on April 18, 1985, directed that in conformity with the terms of the lease, thirty days after notice of entry was served on the debtor there was to be a closing at which the debtor was to deliver possession to LSA and LSA was to pay $350,000.

The debtor's position is predicated on the existence of a "closing" supposedly directed to take place pursuant to Justice Kahn's order and judgment dated April 18, 1985 [Ex. # YYY]. However, no closing is provided for in any of the four decretal paragraphs. The first paragraph awards a judgment in favor of LSA, with costs and disbursements of $115.00. The second decretal paragraph declares Article 32 of the Sparrowbush Apartments lease to be valid and enforceable. The third decretal paragraph directs the debtor to deliver possession of the leased premises thirty days after service of a certified copy of the judgment upon the debtor. The fourth decretal paragraph directs "that upon delivery of possession of the premises as required by the judgment plaintiff shall tender to defendant a certified check in the sum of $350,000 payable or endorsed over to the defendant [LSA]." In order to comply with the state court order the debtor simply had to vacate the premises, following which LSA was directed to tender to the debtor a certified check in the sum of $350,000. The parties never had to meet and no closing in the real estate sense was called for under the order and judgment.

Moreover, there was no real estate deed or contract involved which would form the basis for applying the doctrine that all antecedent claims were waived or merged following a closing. The concept of a voluntary relinquishment of a known right, which underlies the doctrine of waiver, was absent because the parties were ordered to comply with the state court judgment.

Additionally, there was no conveyance of any real estate which could be the subject of a closing. In affirming this court's decision that the automatic stay did not apply, Chief Judge Charles L. Brieant sustained this court's conclusion that the debtor's lease "was cancelled as of February 25, 1985." *In re Cohoes Industrial Terminal, Inc.,* 70 B.R. at 220, *aff'd* No. 87–5004, slip op. at 2 (2d Cir. Sept. 18, 1987). The debtor's interest in the premises after February 25, 1985 was that of a holdover tenant by operation of law. Therefore, the debtor had no leasehold interest to convey when it ultimately delivered the premises to LSA in exchange for the tender of a $350,000 certified check payable or endorsed over to LSA.

The Second Circuit Court of Appeals recently affirmed the decisions of this court and the district court (Chief Judge Charles L. Brieant) and said:

Since the Debtor no longer had any legal interest in the leasehold itself ... there was nothing to transfer to Baker. *Gloria Baker v. Latham Sparrowbush Apartments (In re Cohoes Industrial Terminal, Inc.),* No. 87–5004, slip op. at 2 (2d Cir. Sept. 18, 1987).

If there was no interest to transfer to Baker, there clearly was no interest to transfer to LSA. Hence, the defense of merger of claims following a so-called real estate closing must also fail.

### 4. ACCORD AND SATISFACTION

■ The debtor asserts that because LSA accepted the rent checks while the debtor was a holdover tenant, such acceptance amounted to an accord and satisfaction with respect to any disputed claims. However, there was no proof that the debtor, either expressly or impliedly, submitted the rent checks to LSA with the condition that LSA's acceptance would be deemed payment in full. The rationale for applying the doctrine of accord and satisfaction is that a debtor may impose certain conditions in connection with a payment to a creditor, who is given the option of accepting the payment under the imposed conditions or rejecting both; the creditor may not accept the payment while rejecting the conditions. *See* 19 N.Y. Jurisprudence 2d (Accord and Satisfaction) § 6. Thus, the delivery of a check without conditioning acceptance as payment in full does not constitute an accord and satisfaction. *Manley v. Pandick Press, Inc.,* 72 A.D.2d 452, 424 N.Y.S.2d 902 (App.Div. 1st Dep't.1980), appeal dismissed 49 N.Y.S.2d 981, 428 N.Y.S.2d 950, 406 N.E.2d 805 (1980). A landlord's acceptance of rent which is admittedly due does not bar an action by the landlord for an additional sum which is in dispute, even if payment is made by a check endorsed "in full payment". 3 Rasch, New York Landlord & Tenant Summary Proceedings § 1318 at 127 (2d Ed 1971). In fact if the landlord had refused to accept CIT's rent check, the landlord would not be able to proceed against the tenant as a holdover tenant. *See* 1 Rasch, § 274 at 359. The rent checks which the debtor paid to LSA represented sums admittedly due and their acceptance by LSA does not bar an action for any additional sums due under the lease.

### ADDITIONAL CONTINGENT RENT-STATUTE OF LIMITATIONS-WAIVER

■ Leon Baker's agreement to extend LSA's time for filing objections to the cash flow statements for Sparrowbush Apartments extended and renewed the statute of limitations to December 31, 1985. This extension of waiver is authorized under New York General Obligations Law § 17–103(1), which provides:

§ 17–103. **Agreements waiving the statute of limitations.**

1. A promise to waive, to extend, or not to plead the statute of limitation applicable to an action arising out of a

contract express or implied in fact or in law, if made after the accrual of the cause of action and made, either with or without consideration, in a writing signed by the promisor or his agent is effective, according to its terms, to prevent interposition of the defense of the statute of limitation in an action or proceeding commenced within the time that would be applicable if the cause of action had arisen at the date of the promise, or within such shorter time as may be provided in the promise.

*See Krassner & Co. v. City of New York,* 46 N.Y.2d 544, 389 N.E.2d 99, 415 N.Y.S.2d 785 (1979).

■ The service of LSA's Notice of Intention to Conduct Arbitration prior to December 31, 1985 constituted the commencement of a proceeding to enforce LSA's claim for contingent rent. *See In re Arbitration between Knickerbocker Insurance Co. and Gilbert,* 28 N.Y.2d 57, 320 N.Y.S.2d 12, 268 N.E.2d 758 (1971). As stated in District Court Judge Joseph M. McLaughlin's editorial comment to the New York Civil Practice Law & Rules § 7502(b):

> The statute of limitations on a claim submitted to arbitration stops running when ... a notice of intention to arbitrate is served.

7B McKinney's Consolidated Laws of New York Annotated, § C7502:5 (1980).

New York Civil Practice Law & Rules § 7502(b) allows written agreements to extend or waive the statute of limitations even after the cause of action is time-barred so that the running of the statute of limitations may be renewed on the cause of action covered by the agreement. *Lifset v. Western Pile Co., Inc.,* 85 A.D.2d 855, 446 N.Y.S.2d 487 (1981). Therefore, the debtor's assertion of a statute of limitations defense to LSA's claim for additional contingent rent is dismissed.

## COVENANT TO REPAIR–STATUTE OF LIMITATIONS

■ Generally, in the absence of an express covenant or a statutory duty, a tenant has the obligation to make leasehold repairs caused by ordinary wear and tear and not to commit waste. *In re D.H. Overmyer Co., Inc.,* 12 B.R. 777 (Bankr.S.D.N.Y.1981), *aff'd* 30 B.R. 823 (S.D.N.Y.1983); 2 Rasch, New York Landlord & Tenant Summary Proceedings § 620 at 79 (2d ed. 1971). However, the Sparrowbush Apartments lease, which the debtor assumed, contained express covenants which enlarged the tenant's obligation for repairs so that the debtor was required to make all necessary replacements, additions, betterments, including structural repairs and any extraordinary repairs as well as sharing of foundations and walks of the buildings. The landlord was completely relieved of any responsibility for maintaining the leased premises. In section 9.01 of the lease it is stated that the tenant's obligation for repairs shall continue throughout the term of the lease.

An action for breach of a tenant's covenant to keep the premises in repair throughout the term of the lease may be brought either before or after expiration of the term. *City of New York v. Pennsylvania Railroad Co.,* 37 N.Y.2d 298, 372 N.Y.S.2d 56, 333 N.E.2d 361 (1975); *In re D.H. Overmyer Co., Inc.,* 12 B.R. at 787. The debtor argues that LSA's cause of action accrued when Shaker Estates, Inc., the original tenant, failed to correct the design and construction defects and that this breach continued thereafter. The debtor disputes LSA's position that the statute of limitations did not start to run while the tenant remained in possession and contends that the tenant's obligation to correct design and construction defects accrued when the debtor first assumed title to the leasehold on December 31, 1973. Under § 213 of the New York Civil Practice Law & Rules a six year statute of limitations applies to contract actions. Therefore, according to the debtor's position, LSA's claim for the debtor's breach of the covenant to make structural design and construction repairs would have been time-barred after December 31, 1979.

The debtor cites cases involving the Truth in Lending Act, an exclusive distributorship agreement and an implied warranty

under a twenty-year roof bond. These situations are not applicable to a landlord-tenant relationship where there is a continuing breach of a continuing covenant. In the instant case, the lease terminated on February 25, 1985, well within the six-year statute of limitations for contract actions. Therefore, LSA's action for breach of the debtor's covenant to keep the premises in repair throughout the term of the lease could be brought within six years after the expiration of the term. *City of New York v. Pennsylvania Railroad Co.*, 37 N.Y.2d 298, 372 N.Y.S.2d 56, 333 N.E.2d 361; *In re D.H. Overmyer Co., Inc.*, 12 B.R. 777. The debtor's assertion of a statute of limitations defense to LSA's claim for breach of the covenant to repair is unavailing.

### USE AND OCCUPANCY

A portion of LSA's claim is for the value of the use and occupancy of Sparrowbush Apartments for the period from the termination of the leasehold on February 25, 1985 through and including the date the state court receiver took possession of the property, which was March 28, 1986, a period of approximately thirteen months. However, during this period the debtor submitted monthly rent checks which were accepted by LSA, in the total sum of $154,115.51.

New York Real Property Law § 232–c, which applies to the facts in this case, reads in pertinent part as follows:

> Where a tenant whose term is longer than one month holds over after the expiration of such term ... unless an agreement either express or implied is made providing otherwise, the tenancy created by acceptance of such rent shall be a tenancy from month to month commencing on the first day after the expiration of such term.

In view of the fact that there was no express or implied agreement between LSA and the debtor regarding LSA's acceptance of the rent checks after the Sparrowbush Apartments lease terminated on February 25, 1985, it follows that LSA's acceptance of the debtor's rent checks created a month to month tenancy. *Cobert Construction Corp. v. Bassett*, 109 Misc.2d 119, 442 N.Y. S.2d 678 (App. Term, 1st Dep't.1981); *Bonner v. Nash*, 70 Misc.2d 752, 753, 335 N.Y. S.2d 93, 94 (App. Term, 1st Dep't.1972); *Sowalsky v. E.F. MacDonald Stamp Company, Inc.*, 31 A.D.2d 582, 294 N.Y.S.2d 1016 (App.Div. 3d Dep't.1968) (testimony as to why the rent envelope was retained by the landlord and left unopened was highly probative evidence as to the issue whether or not there had been an acceptance of rent so as to create a month to month tenancy by a holdover tenant in accordance with Real Property Law § 232–c).

A month to month tenant is liable for rent in accordance with the terms and conditions of the lease in effect prior to the holdover period and is not liable for use and occupancy. *Bonner v. Nash*, 70 Misc.2d at 753, 335 N.Y.S.2d at 94. In the *Bonner* case the court said:

> Since appellant remained in possession of the subject premises after the expiration of the term of his lease on September 30, 1969, and since the landlord accepted rent subsequent to the expiration of the term, the tenancy created was one from month to month (Real Property Law § 232–c). Accordingly, for that period of time in which appellant was in occupancy of the subject premises subsequent to September 30, 1969 (up until he vacated the premises), he was a month-to-month tenant required to pay rental in the amount fixed in his lease, to wit $295 monthly, *and not $324.50 monthly for use and occupation.*

Having accepted LSA's monthly rent checks during the holdover period, LSA may not now claim any amounts owed for use and occupancy during this period.

### DAMAGES

A tenant, at common law, in the absence of express covenant or a statutory duty, has an obligation to make leasehold repairs caused by ordinary wear and tear and not to commit waste. 2 Rasch, New York Landlord and Tenant § 620 at 79 (2d ed. 1971). *In re D.H. Overmyer Co., Inc.*, 12 B.R. 777 (1981) *aff'd* 30 B.R. 823 (S.D.N. Y.1983). The parties to a lease may, by

express covenant, enlarge a tenant's obligation to make alterations, repairs and improvements on the premises. *In re Overmyer*, 12 B.R. at 786. An obligation to repair during the term is not modified or cut down by the obligation to surrender at the end of the term in good condition, reasonable use and wear excepted. Even if the two clauses were read together, the tenant would be obligated to make repairs during the term as well as at the termination of the lease. *Gould v. Springer*, 206 N.Y. 641, 99 N.E. 149 (1912); *Edwards v. Ollen Restaurant Corporation*, 198 Misc. 853, 98 N.Y.S.2d 815 aff'd 198 Misc. 858, 103 N.Y.S.2d 512 (Mun.Ct. 2d Dist. 1950). Therefore, the duties imposed on the debtor included making repairs required under the repair clause and to surrender the premises in good condition and repair.

LSA's action is against the Debtor for its failure to comply with the covenants in the repair and surrender clauses contained in the Sparrowbush Apartments lease. The lease is a net lease similar to the lease at issue in *In re Overmyer*, 12 B.R. 777. The court there said:

> ... [T]he form of the covenant in this net lease imposes on the tenant a much higher obligation than his mere covenant to "repair". Where, as here, the provisions of a lease, *inter alia*, relating to the lessee's obligations to repair, are unambiguous, and, in considering all of the material provisions of the lease agreement relating to repairs, the reasonable sense and meaning of the words employed in this type of "net" lease requires us to hold, as plaintiffs urge, that the defendants are under an absolute Obligation to do all that is necessary, structurally or otherwise, to put the subject premises in repair.

*In re Overmyer*, 12 B.R. at 787.

■ It is well settled that "an action for the breach of a tenant's covenant to keep the premises in repair may be brought either before or after the expiration of the term". *In re Overmyer Co., Inc.*, 12 B.R. at 787. The measure of damages differs, depending upon the time when the action is brought. The measure of damages before

the expiration of the lease is the injury to the reversion. When an action is brought after the termination of the lease, the measure of damages is the reasonable cost of making the repairs which the tenant should have made. *See* 2 Rasch, § 634 at 90; *Tobin v. Union News Co.*, 18 A.D.2d 243, 239 N.Y.S.2d 22, *aff'd* 13 N.Y.2d 1155, 247 N.Y.S.2d 385, 196 N.E.2d 735. The measure of damages will not be affected by the fact that the landlord has performed repairs or intends to demolish the buildings. *See Farrell Lines, Inc. v. City of New York*, 30 N.Y.2d 76, 330 N.Y.S.2d 358 (1972). *See also City of New York v. Pennsylvania RR Co.*, 37 N.Y.2d 298, 372 N.Y.S.2d 56, 333 N.E.2d 361 (1975). In view of the fact that LSA brought this action after the termination of the lease, the appropriate measure of damages will be the reasonable cost of the repairs that the Debtor should have made while in possession of the property.

■ Under the terms of its lease, the Debtor was obligated to make all repairs, to the "interior and exterior, structural and nonstructural, ordinary and extraordinary and unforeseen and foreseen". "Repairs" are defined as including "all necessary replacements, renewals, alterations, additions and betterments". Where there is a long term or net lease, and the tenant has time to amortize the cost of repairs to the premises, a repair clause is more apt to be construed literally. Friedman on Leases § 10.601 at 575 (1978).

The debtor asserts that it is not liable for certain structural and nonstructural repairs because such repairs are not required under the repair clause. Thus, the debtor excludes from its repair obligations under the lease shoring of beams, maintenance of the beams and reparation of sidewalks and parking lots.

A structural repair is that which affects "a vital and substantial portion of the premises, including repairs that change its characteristic appearance, its fundamental purposes, the uses contemplated, or a change that would affect the realty itself, such as one which is extraordinary in scope and would require an unusual expenditure to effect." 3 Fribourg & Gerstein, New York Practice Guide § 25.03[5][a] at 25–36

(1987) *citing Pross v. Excelsior Cleaning & Dyeing Co.*, 110 Misc. 195, 201, 179 N.Y.S. 176, 179–80 (Mun.Ct.1920). Structural repairs include replacement or reinforcement of exterior walls; an alteration that involves cutting through floors; replacement of handrails and reparations to a roof. *See* Friedman on Leases, 10.301b at 549 (cases cited). Structural elements include, but are not limited to, exterior load bearing walls, the foundation and the subflooring. 3 Fribourg & Gerstein § 25.-06[4][d] at 25–87 (cases cited). Although maintenance of sidewalks and parking lots is not generally considered structural in nature, the terms of the repair clause in the debtor's lease require that such maintenance should be done. Nonstructural repairs include, but are not limited to, fire escapes, painting, sprinklers, a wall radiator, and sills and trim. *See* Friedman on Leases § 10.301b at 549 (cases cited). Therefore, shoring and maintenance of beams and reparations of the parking lots and sidewalks were required of the debtor under the lease.

Based upon the encompassing terms of the repair clause, the definitions of its terms and the testimony of expert witnesses, the debtor was obligated to make repairs which will cost $735,715.

## CONCLUSIONS OF LAW

1. This court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a). This is a core proceeding in accordance with 28 U.S.C. § 157(b)(2)(B).

2. The issue as to the preclusive effect of the state court decisions with respect to Gloria Baker's assertion that she is the beneficial owner of the Sparrowbush Apartments leasehold interest, and the application of the doctrines of *res judicata* and collateral estoppel as to conclusions of law, which were included in the debtor's reply memorandum of law filed on September 30, 1987, are issues which need not be addressed by this court because of this court's findings of fact.

3. This court has found, as a matter of fact, that the debtor, CIT, was LSA's tenant under the Sparrowbush Apartments lease from December 31, 1973 until termination on February 25, 1985. During this period, Gloria Baker was, at most, an undisclosed principal when Leon Baker designated the debtor, CIT, to be the assignee of the lease and when the debtor assumed such lease on December 31, 1973.

4. The debtor's affirmative defenses of the splitting of a cause of action, *res judicata* and merger by judgment, merger of claims following an alleged closing, accord and satisfaction and reinstatement of the lease by LSA's post-termination acceptance of rent checks, were defenses that were not established by the debtor and are dismissed.

5. LSA's claim for use and occupancy from February, 1985, until March 28, 1986, when the state court receiver took possession of the premises, is denied because LSA's acceptance of rent checks from the debtor created a holdover tenancy, thereby limiting LSA's claim to the amount of rent due during that period.

6. The debtor's defense of the statute of limitations with respect to LSA's claim for additional contingent rent, and the debtor's defense that the additional contingent rent claim is barred by LSA's failure to object by July 20th of the year following the debtor's submission of cash flow statements are defenses which were waived by Leon Baker's agreement to extend LSA's time to object to such statements until December 31, 1985 before which time LSA initiated a cause of action against the debtor.

7. LSA has established that it is entitled to additional contingent rent from the debtor in the total amount of $101,144.

8. The debtor's defense of the statute of limitations with respect to LSA's claim that the debtor breached its obligation under the Sparrowbush Apartments lease to maintain and repair the premises is dismissed because such obligation existed until the lease was terminated on February 25, 1985, at which time such obligation continued during the holdover period until the state court receiver took possession on March 28, 1986.

9. LSA has established that the debtor breached its obligation imposed under the Sparrowbush Apartments lease to maintain

and repair the premises, with respect to which LSA has established that it will cost $735,715.00 to repair what should have been performed by the debtor.

10. The debtor concedes that LSA is entitled to the sum of $115.00 awarded as costs in the state court action. Therefore, this sum is allowed.

11. The arbitration fee of $1750 which LSA paid with respect to the contingent rent issue is allowed, in view of the fact that LSA has established that it is entitled to additional contingent rent and that issue is no longer open.

SETTLE ORDER on notice in accordance with the foregoing Findings of Fact and Conclusions of Law.